IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

ROBERTA ARCHIE and )
BELINDA GIBSON, )
)
    Plaintiffs, )
)
v. )    CIVIL ACTION NO. CV-98-B-1373-J
)
FLAGSTAR ENTERPRISES, INC., )
)
    Defendant. )

**ENTERED**

AUG = 9 2000

## MEMORANDUM OPINION

This action is before the court on the Motion for Summary Judgment filed by defendant

Flagstar Enterprises, Inc. ("Flagstar" or "defendant").  Plaintiff Roberta Archie ("Archie")

alleges that she was subjected to a racially hostile work environment and constructively

discharged in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.

("Title VII") and 42 U.S.C. § 1981 ("§ 1981").  Plaintiff Belinda Gibson ("Gibson") similarly

alleges claims pursuant to Title VII and § 1981 for race discrimination with respect to

promotions, training, discipline, job assignments and pay, retaliation, and constructive discharge.

Upon consideration of the record, the submissions of the parties, the arguments of counsel, and

the relevant law, the court is of the opinion that Flagstar's Motion is due to be granted.

### I.  FACTUAL SUMMARY

**A.**  **Archie's Claims**

During the time period relevant to this case, Flagstar owned and operated the Hardee's

restaurant in Winfield, Alabama.  Also during this time Kathy Gunnells ("Gunnells") was the

general manager; Norma Howell ("Howell"), was the manager; and Bonnie Corbett ("Corbett")

was the regional human resources manager.  (Archie Dep. at 29-30; Corbett Dep. at 12-13.)[1]

Archie was a cashier from March 26, 1996 to June 4, 1996.

Archie went through new hire orientation, during which the employee handbook, (*See*

Archie Dep. at ex. 4), was reviewed with her. (Archie Dep. at 40-41, ex. 3.)  She read and

understood the policies in the handbook, including those prohibiting discrimination, harassment,

and retaliation, and those describing the procedures employees should follow to report such

conduct.  (Archie Dep. at 41-42.)  She was also aware of Flagstar's "open communication

policy" and how to use it. (Archie Dep. at 41-43.)

Flagstar's "open communication policy" prohibits workplace discrimination, harassment,

and retaliation, whether based on sex, race, or any other characteristic protected by law.  (Archie

Dep. at ex. 4, pp. 24-26.)  The policy also instructs employees who believe they have been

subjected to prohibited conduct to report it to their supervisor immediately.  (*Id.*)  Employees

who are not comfortable speaking to their supervisor, or who are not satisfied with the

supervisor's response, may report any incident to any member of management or a human

resources representative. (*Id.* at p. 25.)

The reporting policy described in the handbook provides:

> **While you are encouraged to address problems directly with your supervisor,
> you should raise concerns about discrimination, harassment or other forms
> of improper treatment with Human Resources or any other member of
> management if, for any reason, you do not feel comfortable discussing the
> issue with your supervisor, or do not feel your supervisor has previously
> responded satisfactorily.**

(*Id.* at p. 31) (emphasis in original.)  Additionally, the open communication policy is posted in

---

[1]  Deposition testimony is cited as "(deponent name 'Dep. at' page # and/or exhibit #)."
Declarations are cited as "(declarant name 'Decl.,' paragraph # and/or exhibit #)."

the Winfield Hardee's and identifies Corbett, along with her phone number, as the management official to contact in order to report discrimination, retaliation, and/or harassment. (Corbett Dep. at 20-21; Gunnells Dep. at 20-22.)

Archie complains that during the first week of May 1996, Howell said: "Damn, it's hot in here, I'm sweating like a nigger.  I have Roberta beat tonight." (Archie Dep. at 47.)  There is no evidence indicating that Howell used a racial slur on any other occasion.

Archie reported the incident to Gunnells, who then arranged a meeting with Archie and Howell. (Archie Dep. at 60-63.)  During the meeting, Gunnells informed Howell that Flagstar did not tolerate the use of racially derogatory language, and that if she ever used such language again, she would be disciplined further and possibly terminated. (Archie Dep. at 58; Gunnells Dep. at 59-60; Corbett Dep. at 52-53.)  Additionally, Archie alleges that Gunnells asked her if she had ever used the term "nigger," stated that the term was used on television, and told her this was "basically a laid back society." (Archie Dep. at 46-47.)  Gunnells believed Archie was satisfied with the way the situation was handled because she did not voice any complaints, and she stated that she was "okay." (Gunnells Dep. at 34, 60; Archie Dep. at 43.)  Gunnells was amenable to discussing Archie's complaint, and she allowed Archie to say everything that she wanted to say at the meetings. (Archie Dep. at 63.)  Had Archie voiced dissatisfaction, Gunnells would have taken the matter further. (Gunnells Dep. at 67-68.)

Archie wanted defendant to fire Howell, but she did not voice such desire to Gunnells or any other member of management. (Archie Dep. at 43, 59, 87-88.)  Archie knew that Howell's comment violated Flagstar's policy, and that if she was not satisfied with the way Gunnells handled her complaint, she could complain to a higher level of Flagstar management, but she never did so. (*Id.* at 41-42, 46, 50-51, 56-57, 63.)

3

Archie continued to work for several weeks following Howell's comment. (Archie Dep. at 43-44.) During this time, Archie contends that Howell was short, abrupt, and rude to her when giving her work orders, and critical of her work performance. (Archie Decl. at ¶ 12.) She also felt tension between herself and her co-workers. (Archie Dep. at 67-68.) Archie further contends that during her last two weeks of work, Howell canceled her shift on four occasions and sent her home early on three other occasions. (Archie Decl. at ¶ 12.) Archie claims that Howell falsified the work schedules to make it appear that Archie canceled her shift on the four days in question. (*Id.*) Archie also testified that the marks on the schedule during her last two weeks of work reflecting a canceled shift could have in fact been days when she called in sick or took the day off. (Archie Dep. at 88-89.) Archie did not complain to Gunnells or other Flagstar management about any of the incidents that allegedly occurred after Howell's comment. (*Id.* at 67.)

Archie quit on June 4, 1996, because she felt "threatened" by Howell's comment, and because she "felt that the incident should have been kept confidential." (*Id.* at 44-46.) Archie did not use the open communication policy to complain that she felt threatened. (*Id.* at 46, 63-66.) Further, Archie does not know whether Gunnells or Howell told anyone about the incident. (*Id.* at 65.)

Archie alleges that after she quit Gunnells placed "false information" in her personnel file indicating that she was fired for unsatisfactory job performance. (Archie Decl. at ¶ 15.) The "false information" to which Archie refers is a status slip regarding her termination. The status slip states: "No Rehire – Dissatisfaction with Job."

**B.**    **Gibson's Claims**

   **1.**    **The Jasper Hardee's**

Flagstar owned and operated the Hardee's restaurant in Jasper, Alabama ("the Jasper Hardee's") until March 31, 1998.  On April 1, 1998, Hardee's Food Systems, Inc. ("HFS") bought the Jasper Hardee's.

Gibson began working at the Jasper Hardee's as an hourly employee around January of 1989.  (Gibson Dep. at 26.)  Gibson left the Jasper Hardee's to return to a previous job after about a year.  (*Id.* at 30-31.)  She was rehired in January of 1991, as an hourly management intern.  (*Id.* at 31-32.)  She was then promoted to a salaried assistant manager position on April 16, 1992, and held that position until she quit in July of 1998.  (*Id.* at 50-51, 239-42.)

Under Flagstar's ownership, each Hardee's restaurant had a salaried management team, which consisted of a general manager, a senior assistant manager (or "manager"), one or more assistant managers, and one or more hourly management interns (or "shift leaders") who were in training to be managers.  (Corbett Dep. at 106; Barnette Decl. ¶ 4.)  The general manager reported to a district manager who was responsible for overseeing the operations of several restaurants.  (Barnette Decl. ¶¶ 3-4.)

At all relevant times, Wayne Barnette ("Barnette") was the district manager.  (Barnette Decl. ¶ 5.)  Suzy Ellis ("Ellis") was the general manager until June 18, 1997;  Dale Seals ("Seals") then became the general manager from the end of June 1997, until December 2, 1997; and Alice Leeth ("Leeth") has been the general manager since April 24, 1998.  (Barnette Decl. ¶¶ 5,7-8, 12-13; Leeth Dep. at 20.)  Shane Gilliland ("Gilliland"), Patricia Faulkner ("Faulkner"), and Brandi Bussey ("Bussey") were hourly shift leaders.  (Barnette Decl. ¶ 19; Gibson Dep. at 137-41.)  Steve Diffey ("Diffey") was a general manager in training.  (Barnette Decl. ¶ 21.)

Diffey worked temporarily at the Jasper Hardee's for one week during April of 1998. He was never the general manager. (*Id*.)

Leeth began working for Flagstar in 1981. (Leeth Dep. at 10, 16-17.) Prior to becoming general manager of the Jasper Hardee's, Leeth held the positions of acting general manager, senior assistant manager, and hourly employee. (*Id*. at 10-20.) She was also the general manager of the Sumiton Hardee's during the late 1980's. (*Id*. at 15.)

When HFS assumed control of the Jasper Hardee's on April 1, 1998, it eliminated the senior assistant manager position. All senior assistant managers and assistant managers became "restaurant managers." (Corbett Dep. at 96-97, 106-07; Barnette Decl. ¶ 4.)

### 2.   *Gibson's EEOC Charge*

Gibson filed an EEOC charge on February 3, 1998. (Gibson Dep. at ex. 15.) She claims that shortly thereafter, Leeth received the charge in the mail and faxed it to Barnette. (Gibson Decl. ¶ 7.) Gibson alleges that after Leeth received the charge, Leeth became hostile towards her, only spoke to her when giving her work instructions, and criticized her work performance on a daily basis during March of 1998. (Gibson Decl. ¶¶ 7, 10.)

### 3.   *Gibson's Training*

Gibson contends that Barnette refused to allow her to attend "management training school" on two occasions. Gibson testified that in 1995 or 1996, Ellis told her that she had to attend training school. (Gibson Dep. at 133-34.) However, she further testified that she did not attend because Barnette said it was not necessary for her to attend. (*Id*.) Gibson also claims that she called Barnette in late 1997, or early 1998, and told him that she wanted to be general manager of the Jasper Hardee's and would "go to school if that's what it took." (Gibson Dep. at 141-43.) According to Gibson, Barnette told Gibson he would talk to Corbett about it and get

6

back to her. (Gibson Dep. at 128, 142-43.)

Barnette sent three white hourly shift leaders, Faulkner, Bussey, and Gilliland, to basic management training school. (Barnette Decl. ¶ 19.) None of the three white hourly shift leaders had Gibson's managerial experience. (Id.) These hourly employees attended management training school in order to learn managerial policies, procedures, and skills that Gibson gained on the job as a salaried assistant manager. (Barnette Decl. ¶ 19; Gibson Dep. at 137-41.) Barnette believed that it was unnecessary for Gibson to go through training to acquire skills that she already possessed. (Barnette Decl. ¶ 19.) Gibson does not know what was taught at the training school. (Gibson Dep. at 129-30.)

Barnette gave Gibson the opportunity to attend management training classes appropriate for her level of experience. (Gibson Dep. at 188.) On March 5, 1998, Barnette met with Gibson to discuss her Development Plan,[2] in which he instructed her to attend classes with the regional training manager at the training restaurant in Hanceville, Alabama, attend a profit and loss class, and complete the diversity self-study. Gibson never completed this training. (Gibson Dep. at 186-91, ex. 20; Barnette Decl. ¶ 16.)

### 4.     The Contested Promotions

When Barnette became district manager over the Jasper Hardee's in January 1997, it was ranked at the bottom of the eleven restaurants in the district. (Barnette Decl. ¶ 5.) For this reason, on June 18, 1997, Barnette gave Ellis the choice of resigning or being fired. (Id. at ¶ 6.)

---

[2]   District managers generally draft a Development Plan for managers who receive a marginal performance evaluation. (Barnette Decl. ¶ 15.) Gibson received a marginal performance evaluation on February 22, 1998. (Gibson Dep. at 173, ex. 18.) Consequently, Barnette drafted a Development Plan for her. (Gibson Dep. at 172-76, ex. 18; Barnette Decl. ¶ 15.) Barnette drafted a similar Development Plan for Tracy Wright ("Wright"), the white general manager at the Sumiton Hardee's. (Barnette Decl. ¶ 15.)

Ellis chose to resign. (Barnette Decl. ¶ 6, ex. B.) In Barnette's opinion, the entire management team, which included Leeth and Gibson, was responsible for the restaurant's poor performance. (*Id.* at ¶ 7.) Consequently, Barnette decided to bring in a new general manager from outside the restaurant. (*Id.* at ¶¶ 6-7.)

Barnette replaced Ellis with Seals in late June of 1997. (Barnette Decl. ¶ 7.) Seals had previously worked for Flagstar as a manager on Flagstar's training team,[3] an assistant manager at the Cullman Hardee's, and an acting general manager at the Sumiton Hardee's. (*Id.* at ¶ 8.) Gibson alleges that when Barnette introduced Seals as the new general manager, Barnette told Leeth and Gibson that Seals "does not know much about running a restaurant. You will have to help him in every way you can – teach him what you know." (Gibson Decl. ¶ 13.) Seals quit during the first week of December 1997. (Barnette Decl. ¶ 10.) Between August 15, 1997, and November 21, 1997, Seals was written up by Barnette seven times. (*Id.* at ¶ 10, ex. C.)

After Seals quit, Barnette told Leeth that if she improved the performance of the Jasper Hardee's, he would promote her to general manager. (Barnette Decl. at ¶ 12.) Because of prior poor performance, Barnette was not convinced that she could handle the job. (*Id.*) Barnette told Leeth to hold employees accountable for their performance. (*Id.*) Barnette believed that disciplining poor performing employees would improve the restaurant's performance. (*Id.*)

On April 21, 1998, Barnette promoted Leeth to general manager. (Corbett Decl. ¶ 2, Ex. A; Barnette Decl. ¶ 13.) At that time, Leeth had more experience than Gibson and was higher in the chain of command. (Barnette Decl. ¶¶ 14-15.) After Leeth's promotion, Gibson asked Barnette if he would promote her to "senior assistant manager," Leeth's former position.

---

[3] The training team is a group of highly skilled and very knowledgeable managers who travel from place to place opening new Hardee's restaurants. (Corbett Dep. at 101-03; Barnette Decl. ¶ 8.)

Barnette could not grant Gibson's request for such promotion because HFS had eliminated that position. (*Id.* at ¶ 17.)

### 5. *Discipline*

After Leeth assumed responsibility for the Jasper Hardee's in December of 1997, she "wrote up" Gibson, as well as other employees, for performance problems including: failing to count inventory at the end of the shift, (Gibson Dep. at 153-57, ex. 12-14); failing to complete the Restaurant Progress Report and having a bad food cost variance score, (Gibson Dep. at 168-72, ex. 17); "blowing" payroll, i.e. exceeding the weekly payroll budget, (Gibson Dep. at 181-82, ex. 19; Barnette Decl. ¶ 10); failing to post the line bar schedule on time, (Gibson Dep. at 203-06, ex. 22); changing the manager's schedule without authorization, (Gibson Dep. at 208-12, ex. 23); failing to put information on new hires into the computer, (Gibson Dep. at 213-17, ex. 24); leaving before the shift was over, (Gibson Dep. at 226-28; ex. 27); and yelling at a cashier on the front line. (Gibson Dep. at. 228-33, ex. 28.) Further, Leeth noted that Gibson "Performs Below Performance expectations/standards" on her annual performance evaluation on February 22, 1998. (Gibson Dep. at 172-76, ex. 18.)

Although Gibson admits that some of the write-ups she received could have been based on legitimate performance problems, she also contends that at least some of the write-ups were racially discriminatory and retaliatory based on her belief that Barnette told Leeth to write her up.[4] (Gibson Dep. at 156-57, 169-70, 181-86, 203-05.) Gibson was written up before and after she filed her EEOC charge in February of 1998. Gibson was written up on several occasions in

---

[4] Although Gibson never witnessed such a conversation, she believes that Leeth reported to Barnette about employee performance, and he then instructed Leeth as to who she was to write up. (Gibson Dep. at 235-38.) According to Gibson, Leeth told her each time she received a counseling form that Leeth said "Mr. Barnette said I have to write you up, period, for such and such," and then explained the reasons for the discipline. (Gibson Dep. at 184, 235-38.)

March 1998 and twice in April 1998. (Gibson Dep. at ex. 19, 21, 22, 23, 24, 27, and 28.)

Gibson received no further write-ups after April 27, 1998. (*Id.* at 3x. 28.)

### 6.    *Gibson's Resignation*

Gibson quit without notice in July of 1998, allegedly because of the write-ups she

received during January, February, March, and April. (*Id.* at 239-42.) Gibson further alleges

that her job became unbearable when Barnette told her, Leeth, and the white shift leaders during

a meeting in May of 1998, that in order to receive a promotion they would have to prove

themselves. (Gibson Dep. at 241-44.) After Gibson quit, she did not receive a bonus check to

which she alleges she is entitled. (*Id.* at 249-52.) According to the personnel policies and

procedures used by Flagstar, as well as HFS,[5] employees who quit without notice are not entitled

to receive a bonus. (Corbett Decl. ¶ 4.)

### II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact

and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The

party asking for summary judgment bears the initial burden of showing that no genuine issues

exist.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e)

requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue

for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[5] HFS took over from Flagstar in 1998.  (Corbett Decl. ¶ 4.)

10

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  DISCUSSION

**A.     Archie's Claims**

Archie asserts two claims: (1) that she was subjected to a racially hostile work environment in violation of Title VII; and (2) that she was constructively discharged.[6] Archie bears the burden of proving by a preponderance of the evidence that Flagstar intentionally discriminated against her because of her race.

### *1.     Archie's Hostile Environment Claim*

Title VII of the Civil Rights Act of 1964, as amended, prohibits employer discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of

---

[6]  In addition to these two claims, Archie also originally asserted (1) an equal pay claim pursuant to the Equal Pay Act, 29 U.S.C. §§ 206 *et seq.*; (2) a Title VII race claim alleging that she was denied promotion opportunities and paid less than similarly situated white employees; and (3) a Title VII retaliation claim based on the alleged reduction of her work hours following her complaint regarding Howell's racial comment. (*See* Amended Complaint at ¶¶ 7-11, 14-15.)

On September 17, 1999, Archie voluntarily dismissed her Equal Pay Act and retaliation claims. (*See* Dismissal of Claims, filed on September 20, 1999.) Additionally, as to Archie's Title VII pay and promotion claims, plaintiff's counsel stated at oral argument on December 2, 1999, that Archie was voluntarily dismissing these claims. Consequently, the court does not address those claims in this opinion.

Also at oral argument, plaintiffs' counsel orally moved to amend the complaint to assert a retaliation claim based on Howell's use of a racial slur, as well as her treatment of Archie following the incident. The court denied the motion as untimely.

employment because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1).  The Supreme

Court set forth the analytical framework to be followed in cases involving discrimination based

on harassment by a supervisor in the companion cases of *Faragher v. City of Boca Raton,* 524

U.S. 775 (1998) and *Burlington Industries v. Ellerth,* 524 U.S. 742 (1998).  However, the

threshold question is whether discrimination has, indeed, occurred. *See Burlington Industries,*

524 U.S. at 754.  Archie alleges that she suffered from racial discrimination when Howell said:

"Damn, it's hot in here, I'm sweating like a nigger.  I have Roberta beat tonight."

a.    <u>Prima Facie Case</u>

An employer may be liable for subjecting an employee to a hostile work environment if

the employer's conduct "has the purpose or effect of unreasonably interfering with an

individual's work performance or creating an intimidating, hostile, or offensive environment."

*Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 65 (1986) (citation omitted); *Steele v.*

*Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir. 1989).  Hostile work environment

sexual harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation,

ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510

U.S. 17, 21 (1993) (internal citations omitted); *see also Cross v. Alabama*, 49 F.3d 1490, 1507

(11th Cir. 1995).  In order to succeed on her hostile environment claim, Archie must demonstrate

that: (1) she belongs to a protected class; (2) she was subjected to unwelcome racial harassment;

(3) the harassment was based on race; and  (4) the harassment affected a term, condition, or

privilege of employment. *Malone v. K-Mart Corp.,* 51 F.Supp.2d 1287, 1306 (M.D. Ala. 1999)

(citing *Ellis v. Wal-Mart Stores, Inc.,* 952 F.Supp. 1522, 1526 (M.D. Ala. 1996) and *Henson v.*

*City of Dundee,* 682 F.2d 897, 903-05 (11th Cir. 1982)).

12

The conduct at issue must be severe or pervasive enough to create an "objectively hostile or abusive work environment" to be actionable under Title VII. *Harris*, 510 U.S. at 21; *see also Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). Thus, the "mere utterance" of a remark that engenders offense does not affect the terms, conditions, or privileges of employment to a sufficient degree to violate Title VII. *Henson*, 682 F.2d at 904; *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) ("Incidental, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability. Discourtesy or rudeness, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment.") (citations and internal quotations omitted).

In addition, whether an environment is "hostile" or "abusive" must be determined by looking at the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *Edwards*, 49 F.3d at 1521-22; *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (4th Cir. 1997) (whether racial slurs constitute a hostile work environment typically depends upon "the quantity, frequency, and severity" of those slurs, considered "cumulatively in order to obtain a realistic view of the work environment") (citations omitted). The standard is "demanding," and the conduct alleged must be "extreme." *Faragher*, 524 U.S. at 788.

Archie has not established a prima facie case because the conduct at issue does not rise to the level of severity or pervasiveness as required under the law. First, the conduct was infrequent. The evidence contains only one incident in which Howell made a racial slur.

13

(Archie Dep. at 47-48.)  An allegation that a racial slur was made once, or even on a few isolated occasions, is insufficient as a matter of law to create a hostile environment; rather, the alleged racial slurs must "be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'"  *Edwards,* 49 F.3d at 1521; *see also EEOC v. Beverage Canners, Inc.,* 897 F.2d 1067, 1070 (11th Cir. 1990) ("not all racial slurs rise to the level of a Title VII violation"); *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2nd Cir. 1987) (to "demonstrate a hostile work environment more than an episodic pattern of racial antipathy must be proven to obtain statutory relief"); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981) ("More than a few isolated incidents of harassment must have occurred.  Racial comments that are merely part of conversation, are accidental, or are sporadic do not trigger Title VII's sanctions.") (citations and quotations omitted).

Further, although inappropriate, Howell's comment was not physically threatening,[7] nor did it "unreasonably interfere" with Archie's employment.  Archie continued to work for several weeks after the incident.  (Archie Dep. at 43-44.)  Despite Archie's allegations that Howell was "rude" to her, criticized her work performance, canceled her shift and/or sent her home early on occasion, she has failed to provide any evidence that Howell's actions were racially motivated.  There is no evidence that Howell was rude only to black employees, criticized only black employees' performance, or canceled only black employees' shifts.[8]  It is axiomatic that racial

---

[7] Archie infers in her Brief in Opposition to the Defendant's Motion for Summary Judgment that Howell threatened her with violence when she said "I've got Roberta beat tonight."  However, such an inference is not supported by the evidence.  Archie admitted that Howell never threatened her with physical harm.  (Archie Dep. at 45.)  Moreover, considering Archie's version of Howell's comment, (*See* Archie Dep. at 47), it is evident that Howell meant that she had Archie "beat" as to sweat.

[8] Further, Archie's assertion that Howell "falsified" the work schedules is not supported by the evidence.  First, Archie admitted that she did not know who prepared the work schedules.  She

harassment must be based on race.   In fact, Archie testified that Howell mistreated "everyone,"
and that her conduct was essentially the same both before and after the incident.  (Archie Dep. at
67-68.)  Without some evidence that white employees were treated more favorably, Archie
cannot raise an inference of racial discrimination.

Archie also alleges that subsequent to her resignation, "false information" was placed in
her personnel file indicating that she had been "terminated because the manager was unsatisfied
with her job performance."[9]  (Pls.' Br. at 20.)  However, assuming this is true, such conduct does
not support Archie's hostile environment claim because it occurred *after* she resigned.  Further,
Archie's claim that Flagstar took such action in order to give her a "bad reference" is
speculative.  Archie has failed to produce any evidence regarding the reasons such information
was placed in her personnel file or whether any reference – good, bad or otherwise – was
actually given to a subsequent employer.

Because the conduct upon which Archie bases her claim was not severe and pervasive,
Flagstar is entitled to judgment as a matter of law on Archie's claim that she was subjected to a
racially hostile environment.

b.   Affirmative Defense

Assuming arguendo that Archie had established a prima facie case, Flagstar is still
entitled to summary judgment because it has established the affirmative defense as articulated in

---

also testified that she did not know the significance of a line drawn through a scheduled work date
on the work schedule. (Archie Dep. at 88.)  Archie admitted that such marks on her schedule may
have indicated that she called in sick or took the day off. (*Id.*)  Additionally, the work schedules in
question contain no indication of the individual responsible for the cancellation decision or the
reasons for cancellation. (*See* Archie Dep. at ex. 2.)  Consequently, Archie's claim is, at best,
speculative and conclusory.

[9] To the extent Gunnells testified that Archie was not eligible for rehire, such testimony was
based on Gibson's failure to give notice, not poor work performance. (Gunnells Dep. at 127.)

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). In *Faragher* and *Burlington Industries*, the Supreme Court defined the standard for determining whether a Title VII defendant may be held liable for the harassing conduct of a "supervisor with immediate (or successively higher) authority over the employee," such as Howell. *Faragher*, 524 U.S. at 807-10; *Burlington Industries*, 524 U.S. at 754-66. First, if the harassment culminated in some "tangible employment action" against the plaintiff by the alleged harasser, then the company is liable for that harassment. Second, absent "tangible employment action," the employer can avoid liability by presenting evidence satisfying the two prongs of the affirmative defense. Here, no tangible employment action was taken against Archie. Therefore, Flagstar is entitled to the affirmative defense.

As noted, where intangible employment action by the supervisor is involved, an employer may assert an affirmative defense to preclude liability. To succeed on this defense, the employer must show, "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1367 (11th Cir. 1999) (citations omitted).

> i. *Reasonable Care to Prevent and Promptly Correct any Harassment*

"A court's assessment as to whether a defendant has proved this defense requires, first, an analysis of whether the employer has exercised reasonable care in preventing sexual harassing behavior." *Coates*, 164 F.3d at 1369. When an employer promulgates a workable anti-harassment policy, it normally meets its burden under the first element of the affirmative

16

defense. *See Faragher*, 524 U.S. at 807-08 (formal sexual harassment policy with sensible complaint procedure satisfies employer's duty of care); *Shaw v. Autozone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999) ("While not required as a matter of law, . . . the existence of an appropriate anti-harassment policy will often satisfy this first prong . . . because Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms.") (internal citations and quotation marks omitted).  In addition, the employer must show that "those employees authorized by the policy to act in response to the complaints did so act when put on notice of a problem and that the actions constituted a reasonable response under the circumstances." *Coates*, 164 F.3d at 1369 n. 5 (J. Barkett concurring).

It is undisputed that Flagstar's policies and procedures regarding workplace harassment, both racial and sexual, are clear and comprehensive.  Archie was familiar with these policies and procedures, which had been explained to her during the new hire orientation.  (Archie Dep. at 41-42.)  Further, Archie had received and read a copy of the employee handbook.  (*Id.* at 40-41.) Archie knew that Howell's conduct violated defendant's policies, and she also knew that if she was unsatisfied with Gunnells's handling of her complaint, she could complain to Flagstar officials outside the store.  (*Id.* at 41-42; 46; 50-51; 56-57; 63; 65-66.)  Indeed, the open communication policy was posted in the Winfield Hardee's and Corbett, the regional human resources manager, was listed as an official employees could contact with any such complaints. (Gunnells Dep. at 20-22; Corbett Dep. at 20-22.)

Thus, Flagstar has met its burden of promulgating an effective policy.  *See Coates* 164 F.3d at 1369-70 (finding that the first element of the *Faragher* defense was met because employer "had in place an officially promulgated, user-friendly, sexual harassment policy"); *Shaw*, 180 F.3d at 811-12 (affirming summary judgment for employer on *Faragher* affirmative

17

defense where "anti-harassment policy made clear [the employer's] stand that harassment will not be tolerated, and provided for multiple mechanisms for the proper resolution of complaints"); *Maddin v. GTE of Florida, Inc.*, 33 F. Supp. 2d 1027, 1032-33 (M.D. Fla. 1999) (granting summary judgment for employer on *Faragher* affirmative defense where "[employer's] sexual harassment policy made it clear that sexual harassment would not be tolerated and provided a number of avenues through which sexual harassment could be reported").

Moreover, Gunnells's response to Archie's complaint under the circumstances was prompt and reasonable. Gunnells immediately met with and disciplined Howell. This response was effective inasmuch as there is no evidence that Howell made any further racial remarks. Although Archie contends that she wanted Howell fired, she admits that she never told this to Gunnells. Instead, Archie told Gunnells she was "okay." Gunnells stated that had Archie informed her that she was dissatisfied with defendant's resolution of the matter, she would have taken the matter further. Based upon Archie's response, however, Gunnells believed the matter was resolved. Thus, the court concludes that Gunnells's actions were sufficient to satisfy Flagstar's duty to promptly and adequately respond to Archie's harassment complaint, as required under the first prong of the affirmative defense. *See, e.g., Montero v. AGCO Corporation*, 192 F.3d 856, 862-64 (9th Cir. 1999) (employer's response within eleven days of plaintiff's complaint was prompt and reasonable as a matter of law).

### ii.    *Unreasonable Failure to Complain*

The second step in this analysis is to determine whether the employee "made reasonably sufficient use of available avenues to put the employer on notice of the problem." *Coates*, 164 F.3d at 1369. Archie admits that, although she was dissatisfied with Gunnells's response to her

complaint, she never complained further about the way Gunnells handled the situation or Howell's alleged subsequent conduct, despite her knowing that she could do so. (Archie Dep. at 41-42, 50.)  Archie had an obligation to use Flagstar's established reporting procedures and she knowingly failed to do so.  *See Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998) ("[T]he law against sexual harassment is not self-enforcing, and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists.") (citations and internal quotations omitted).

Archie offered no evidence justifying her failure to complain.  The first time she complained, Gunnells took immediate action.  The court cannot ascertain any factual basis for Archie's belief that using Flagstar's complaint procedures would have been futile.  Although Archie alleges that she was afraid to complain, such contention fails in light of her previous complaint, as well as her testimony that she knew any "repercussions" she suffered for complaining would constitute unlawful retaliation.  (Archie Dep. at 50-51.)  Archie's unfounded "fear" is an insufficient excuse as a matter of law.  *See, e.g., Shaw*, 180 F.3d at 813 ("[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Burlington Industries* to alert the employer to the allegedly hostile environment."); *Fierro v. Saks Fifth Avenue*, 13 F. Supp. 2d 481, 492 (S.D.N.Y. 1998) ("A generalized fear [of repercussions and an unpleasant outcome] can never constitute reasonable grounds for an employee's failure to complain to his or her employer."); *Jones v. USA Petroleum*, 20 F. Supp. 2d 1379, 1386 (S.D. Ga. 1998) (conclusory allegations of a fear of repercussions for complaining are insufficient to show that employee was reasonable in not complaining).  Archie offers no other justification for her failure to utilize Flagstar's reporting procedures.

Defendant has met both prongs of the affirmative defense as set out in *Faragher* and *Burlington Industries*. Accordingly, even if Archie had established a prima facie case of a racially hostile work environment, Flagstar would still be entitled to judgment as a matter of law.

### 2.    *Archie's Constructive Discharge Claim*

To establish that she was "constructively discharged," Archie must show that her "working conditions were so difficult or unpleasant that a reasonable person would be compelled to resign." *Hill v. Winn-Dixie, Inc.*, 934 F. 2d 1518, 1527 (11th Cir. 1991) (citations omitted). The Eleventh Circuit requires evidence of "a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'" *Id*. A reasonable employee does not "assume the worst" or "jump to conclusions too fast." *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987).

Archie has not produced any evidence that her working conditions were so "intolerable" that a *reasonable* person in her position would be compelled to resign. She alleges that she quit because (1) she felt "threatened" by Howell's comment, (Archie Dep. at 44-46; Archie Decl. ¶ 14); (2) Howell's comment should have been kept confidential, (Archie Dep. at 63-65); (3) Howell was rude to her and "short" with her, (Archie Dep. at 66-68; Archie Decl. ¶ 12); (4) her co-workers refused to speak to her, (Archie Dep. at 66-68; Archie Decl. ¶ 13); and (5) Howell allegedly canceled her shift on four occasions and sent her home early on three other occasions, (Archie Decl. ¶ 12). Assuming these allegations are true, Archie has failed to allege facts sufficient to constitute a constructive discharge.

First, there is no objective evidence to support Archie's claim that she felt "threatened" by the incident with Howell. Even if Archie felt threatened, such feelings were not objectively reasonable under the circumstances. Further, when Archie complained to Gunnells about the

incident, immediate action was taken. (Archie Dep. at 61-63.) Howell was disciplined.
(Gunnells Dep. at 56-57.) Howell never used a racial slur again and never physically threatened
Archie. (Archie Dep. at 44-45.) No other Flagstar employee threatened Archie or took racially
discriminatory action against her. (*Id.* at 45-46, 48.) Archie admitted that Gunnells gave her
full opportunity to voice her concerns, and she never complained that she was dissatisfied with
the way Gunnells handled the situation. (*Id.* at 41-42, 50-51.) Moreover, Archie continued to
work for several weeks after the incident without any complaints. (*Id.* at 43-44.) Based on this
evidence, a reasonable employee would not have felt "threatened" to such a degree that quitting
was the only recourse. Instead, a reasonable employee with Archie's knowledge of Flagstar's
complaint procedures would have utilized them.

The additional grounds Archie advances as reasons for quitting do not support a claim for
constructive discharge. Her unsupported belief that Gunnells and Howell told other employees
about the incident is speculative. There is no evidence indicating that Gunnells or Howell told
other employees about the incident. In fact, Archie admits that the incident occurred in the
lobby of the restaurant and was witnessed by at least one other employee. (Archie Dep. at 75.)

Likewise, Archie's complaint that Howell was short with her and that "tension" existed
between them is insufficient to support a constructive discharge claim. *See Hill*, 934 F.2d at
1527 (written reprimand and criticism of plaintiff insufficient to support a constructive discharge
claim); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360-61 (2nd Cir. 1993) (undue criticism and
poor performance evaluation not sufficient for constructive discharge); *Spence v. Maryland
Casualty Co.*, 995 F.2d 1147, 1156-58 (2nd Cir. 1993) (pervasive criticism accompanied by
yelling and pounding on table did not constitute constructive discharge). Archie cannot show
that Howell's purported conduct, or that of any other employees, affected any tangible aspect of

21

the terms and conditions of her employment.  (*See* Archie Dep. at 66-68.)

Archie's claim that Howell canceled her shift and sent her home early on occasion during a two week period likewise fails to justify her resignation.  There is no evidence that Howell only canceled Archie's shift or otherwise singled her out for mistreatment.  In fact, Archie admitted that the days Howell purportedly canceled her shift were, in fact, days she might have called in sick or taken the day off.  (Archie Dep. at 88-89.)  Considering all the evidence before the court, it is clear that Archie simply "assumed the worst."  This conclusion is further supported by the fact that Archie never complained about Howell's conduct or that of her co-workers, despite her knowledge of the procedure for doing so.  (*Id.* at 67.)  Employees must give employers the opportunity to correct a situation.

> A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation.  None of the plaintiffs returned to work after complaining to the company's corporate management.  Summary judgment on the constructive discharge claim was appropriate; the plaintiffs did not allow sufficient time for [the employer] to correct the situation.

*Kilgore v. Thompson & Brock Mgt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).  Archie failed to allow sufficient time to correct the allegedly unlawful situation.

There is no evidence before the court on which a reasonable jury could find that Archie's working conditions were so difficult or unpleasant that a reasonable person would be compelled to resign.  Consequently, Flagstar is entitled to judgment as a matter of law as to Archie's claim that she was constructively discharged.

## B.    Gibson's Claims

Gibson asserts three claims against Flagstar:  (1) race discrimination in violation of Title VII and § 1981; (2) retaliation in violation of Title VII; and (3) constructive discharge.

22

### 1.    *Gibson's Race Discrimination Claims*

Gibson alleges that Flagstar discriminated against her on the basis of her race by (1) failing to promote her on three occasions; (2) disciplining her; (3) not permitting her to go to shift leader training; (4) forcing her to work "out of her job classification;" (5) requiring her, as well as the entire management team at the Jasper Hardee's, to "prove themselves" prior to promotion; and (6) failing to pay her a bonus after she resigned. (*See* Gibson Dep. at 266-67.)

In any action alleging disparate treatment by an employer, the plaintiff must prove the employer acted with a discriminatory motive. *International Board of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). To establish a prima facie case of discrimination, a plaintiff may employ direct evidence of discriminatory intent, statistical proof of a pattern of discrimination, or circumstantial evidence. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989). The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon whether the plaintiff's proof is direct or circumstantial in nature.

#### a.    Direct Evidence

The parties agree that there is no direct evidence to support plaintiff's claim of disparate treatment race discrimination. Thus, plaintiff must rely on circumstantial evidence to support her claims.

#### b.    Circumstantial Evidence

Because plaintiff is relying on circumstantial evidence to support her claims, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit

jurisprudence).[10]  Under this framework, the plaintiff bears the initial burden of establishing a

prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. "The facts necessarily will

vary in Title VII cases, and the specification [] of the prima facie proof required from [plaintiff]

is not necessarily applicable in every respect to differing factual situations." *McDonnell*

*Douglas,* 411 U.S. at 802 n. 13.

If the plaintiff successfully establishes a prima facie case, the burden of production shifts

to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment

action. *McDonnell Douglas*, 411 U.S. at 802. Defendant's burden to rebut the presumption

created in such a situation is one of production rather than proof, requiring defendant to

articulate a legitimate, nondiscriminatory reason for its action. *Burdine*, 450 U.S. at 257-58. In

satisfying this burden:

> [t]he employer's burden of rebuttal is "exceedingly light."  Since
> the rebuttal burden is one of production only, the employer "need
> not persuade the court that it was actually motivated by the
> proffered reasons . . . .  It is sufficient if the [employer's] evidence
> raises a genuine issue of fact as to whether it discriminated against
> the [employee]."

*Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1495 (11th Cir. 1989) (quoting

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254-55 (1981)) (alterations in

original).

If the defendant succeeds in carrying this burden, then any "presumption of

discrimination created by the *McDonnell Douglas* framework drops from the case, and the

factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation

---

[10]  Gibson's discrimination claims under Title VII and under § 1981 are analyzed under the same legal standard. *See generally Lincoln v. Board of Regents,* 697 F.2d 928, 935 n. 6 (11th Cir. 1983) (holding that the elements of a discrimination claim under § 1981 and Title VII are identical).

omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere
pretext for unlawful motives (i.e., discrimination or retaliation). *Id.* A plaintiff's prima facie
case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's
proffered explanation for its actions is enough to preclude entry of judgment as a matter of law.
*See Combs*, 106 F.3d at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At
all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the
defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511
(1993).

To avoid summary judgment, Gibson must submit sufficient nonconclusory evidence that
Flagstar's articulated legitimate reasons were pretextual. *Elrod v. Sears, Roebuck & Co.*, 939
F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir.
1989). Gibson must put forth concrete evidence that casts sufficient doubt on Flagstar's
proffered reasons such that a reasonable fact finder would conclude that those reasons did not
actually motivate the promotion decisions. *See Combs*, 106 F.3d at 1538; *Earley v. Champion
Int'l. Corp.*, 907 F.2d 1077, 1083-84 (11th Cir. 1990).

### i.    *Gibson's Promotion Claims*

To establish a prima facie case of discriminatory failure to promote, Gibson must prove
that: (1) she is a member of a protected class; (2) she was qualified for and applied for the
promotion; (3) she was rejected in spite of her qualifications; and (4) the individual who received
the promotion is not a member of the protected class and had lesser or equal qualifications.
*Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 642 (11th Cir. 1998). Gibson
claims she was denied four promotions because of her race: (1) Barnette's promotion of Seals in

June of 1997,[11] (2) Barnette's promotion of Leeth in April of 1998, (3) Barnette's failure to promote Gibson to senior assistant manager in April of 1998, and (4) the alleged promotion of Diffey in April of 1998. The court addresses each of these claims separately below.

### (a)    June 1997 Promotion of Seals

As to Barnette's promotion of Seals in June 1997, Gibson offers no evidence that she was qualified for the position of general manager. To the contrary, the evidence shows that she received a marginal performance evaluation only a few months earlier, (Gibson Dep. at ex. 11), and the performance of the Jasper Hardee's was among the worst in Barnette's region, (Barnette Decl. ¶ 5). Conversely, Seals had experience on Flagstar's training team, a highly skilled and knowledgeable group of managers who opened restaurants. He had been the acting general manager at the Sumiton Hardee's prior to his promotion. Gibson's lack of comparative qualifications prevents her from establishing a prima facie case. *See Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520-21 (11th Cir. 1990) (plaintiff could not establish "qualified" prong where she failed to meet employer's performance expectations); *Mills v. First Federal Savings & Loan Ass'n*, 83 F.3d 833, 843 (7th Cir. 1996) (same); *Douglas v. Evans*, 916 F.Supp. 1539, (M.D. Ala. 1996) (same), *aff'd*, 116 F.3d 492 (11th Cir. 1997).

Assuming that Gibson established a prima facie case as to this promotion, Flagstar has articulated legitimate, nondiscriminatory reasons for its decision. Barnette promoted Seals

---

[11] Gibson's Title VII claim based on Seals's promotion is time barred. As a prerequisite to suit, Title VII requires a charging party to file a charge of discrimination with the EEOC within 180 days of the alleged discriminatory act. 42 U.S.C. § 2000e-5(3); *Delaware State College v. Ricks*, 101 S.Ct. 498, 503 (1980). Here, Barnette made the decision to promote Seals to general manager in late June of 1997. (Barnette Decl. ¶ 7.) Gibson did not file her EEOC charge until February 3, 1998, (Gibson Dep. at ex. 15), which is more than 180 days after the challenged promotion decision was made. Consequently, she cannot pursue a Title VII claim on this basis. Nevertheless, Gibson can state a § 1981 claim with respect to this promotion.

rather than Gibson because, in addition to Seals's superior credentials, Barnette wanted a manager from outside the Jasper Hardee's due to that management team's poor performance. (Barnette Decl. ¶¶ 7-9.)

Plaintiff has failed to meet her burden of raising a genuine issue of fact with respect to the legitimacy of these articulated reasons. Three types of evidence are normally used to prove pretext: (1) comparative evidence, (2) statistical evidence, and (3) direct evidence in the form of discriminatory statements and admissions. *Miles v. M.N.C. Corp.,* 750 F.2d 867, 870 (11th Cir.1985). Gibson offers no direct evidence,[12] nor any statistical analysis. To the extent that comparative evidence exists, it demonstrates that Barnette promoted the candidates he believed were the best qualified. "If an employer selects the person it believes is best qualified, an argument of pretext ordinarily will fail." *Smith v. Horner*, 839 F.2d 1530, 1538 (11th Cir. 1988); *Scales v. J.C. Bradford & Co.,* 925 F.2d 901, 907 (6th Cir. 1991) (same).

Although Gibson states that it is "undisputed" that she was more qualified than Seals, (Pls.' Br. at 14-15), her assertion is not supported by the evidence. Gibson admits that she has no knowledge of Seals's qualifications or experience with Flagstar. (Gibson Dep. at 108-10.) For this reason, she cannot cast doubt on Barnette's assertion that he promoted Seals because he believed at that time that he was the most qualified candidate. (*See* Barnette Decl. ¶ 9.) Gibson

---

[12] When questioned whether she had ever heard Barnette use a racial slur, Gibson testified that once at a meeting, Barnette told a group of managers that included Leeth and Gibson that his son had said, "we be jammin'." (Gibson Dep. at 217-22.) Barnette allegedly asked the group, "What would you do if your son came home talking like that?" (Gibson Dep. at 219.) Gibson believes that the phrase "we be jammin'" is a racial slur. (*Id.* at 221.) She admits, however, that when he made the statement he made no reference to any ethnic group, nor did anyone else at the meeting. (Gibson Dep. at 220.) Such a comment simply does not rise to the level of direct evidence as required by the Eleventh Circuit. *See Earley*, 907 F.2d at 1081. Gibson further admits that she never heard Barnette use the term "nigger" or any other similar racially offensive term. (Gibson Dep. at 221-22.)

argues that because Seals turned out to be a bad general manager, Barnette could not have thought he was better qualified than her at the outset. However, such an argument fails. The essential inquiry is what Barnette thought *at the time* he made the promotion decision. Because plaintiff has not put forth sufficient evidence on which a reasonable jury could conclude that defendant's articulated reasons for promoting Seals were pretext for illegal race discrimination, defendant is entitled to judgment as a matter of law on this claim.

### (b)    Promotion of Leeth to the General Manager Position in April 1998

As to Barnette's promotion of Leeth in April of 1998, Gibson cannot establish a prima facie case because she cannot identify a non-protected employee who was treated more favorably. Leeth is also an African-American. (Gibson Dep. at 211.) *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995) (employer entitled to summary judgment where the African-American plaintiff was replaced by an African-American and plaintiff failed to present evidence that the filling of the vacancy was pretextual).

Additionally, the evidence shows that Leeth was more qualified than Gibson: (1) Leeth had greater experience with Flagstar; (2) she had been general manager at the Sumiton Hardee's; (3) she had been acting general manager at the Jasper Hardee's; and (4) she was higher in the chain of command than Gibson. (Leeth Dep. at 10, 16-17; Barnette Decl. ¶¶ 13-14.) By contrast, Gibson's performance during the months preceding Leeth's promotion was marginal. (Gibson Dep. at ex. 11-14, 17-24.) Even if Leeth was not a member of the protected group, Gibson could not establish a prima facie case because she failed to meet Flagstar's performance standards. *See Baker*, 903 F.2d at 1520-21 (plaintiff's failure to meet employer's performance standards prevented her from establishing the qualified prong); *Brook v. City of Montgomery*,

28

916 F.Supp. 1193, 1206-07 (M.D. Ala. 1996) (plaintiff could not establish prima facie case where comparators were more qualified).

Assuming that Gibson established a prima facie case as to this promotion, Flagstar has articulated a legitimate, nondiscriminatory reason for its decision. Barnette promoted Leeth because of her good performance while she was acting general manager and her overall prior experience. (Barnette Decl. ¶ 13.) *See Hill v. Seaboard Coast Line Railroad Co.*, 885 F.2d 804, 808-09 (11th Cir. 1989) (selection of more qualified candidate constitutes legitimate business reason).

Because plaintiff has failed to meet her burden of raising a genuine issue of fact with respect to the legitimacy of defendant's articulated reasons for promoting Leeth, defendant is entitled to judgment as a matter of law on this claim.

### (c)    *April 1998 Senior Assistant Manager Promotion*

Gibson also contends that, in the absence of her promotion to general manager, she should have been promoted to Leeth's former position, "senior assistant manager," when Leeth was promoted. (Gibson Dep. at 245-46.) It is undisputed, however, that the senior assistant manager position was abolished by HFS. (*See* Barnette Decl. ¶ 17.) Thus, defendant cannot be guilty of discriminatorily denying Gibson a promotion to a position that did not exist.[13]

---

[13] Even if the position existed, Barnette's failure to promote Gibson could not be construed as racially discriminatory. In essence, Gibson claims that Leeth's promotion should have resulted in "domino" promotions for the rest of the management team. However, Gibson has not identified any similarly situated, white employee who was "automatically" promoted after a superior received a promotion. In fact, the evidence here suggests that such a practice does not occur inasmuch as none of the white shift leaders were "bumped up" by Barnette after Leeth's promotion. The lack of a comparator is fatal to Gibson's prima facie case. *See Jones v. Bessemer Carraway Med. Center*, 137 F.3d 1306, 1313 (11th Cir. 1998) (No prima facie case where plaintiff failed to present sufficient evidence that nonminority, similarly situated employees were treated more favorably than her) (modified in part on other grounds); *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980) (same).

Assuming arguendo that Gibson established a prima facie case as to this promotion, Flagstar has articulated a legitimate, nondiscriminatory reason for its decision. Barnette did not promote Gibson to senior assistant manager because HFS had eliminated the position. (Barnette Decl. ¶ 17.)

Plaintiff has failed to meet her burden of raising a genuine issue of fact with respect to the legitimacy of defendant's articulated reason. As to Barnette's refusal to promote Gibson to "senior assistant manager" after Leeth's promotion, Gibson has not identified any similarly situated white employee who was promoted by virtue of a supervisor's promotion. Further, Gibson has failed to produce any evidence that Barnette's decision not to promote her to senior assistant manager was based on anything other than HFS's decision to eliminate the position. Clearly, that decision affected not just Gibson, but *all* employees, regardless of their race. Moreover, Gibson offers no evidence showing that any employee who was not in the protected class was promoted to the senior assistant manager position after HFS bought Flagstar.

### (d)    *Diffey's April 1998 Promotion*

As to the alleged promotion of Diffey in April 1998, Gibson cannot establish a prima facie case because Diffey was not promoted to any position that Gibson sought. Flagstar has produced testimony and documentary evidence that Diffey, a new hire, worked only temporarily at the Jasper Hardee's in April 1998. (Barnette Decl. ¶ 21; Corbett Decl. ¶ 2, ex. A, p . 4.) Further, Seals was not the general manager. Gibson testified that Diffey was not hired until at least three months after Seals quit, and that he was not actually the general manager. (Gibson Dep. at 114-18.) She further admitted that Barnette never told her that Diffey was the general manager. (*Id.* at 117.) Rather, he told her that Diffey was in the restaurant for training purposes.

30

(*Id.*; *see also* Barnette Decl. ¶ 21.)[14]

Assuming that Gibson established a prima facie case as to this promotion, Flagstar has articulated a legitimate, nondiscriminatory reason for its decision.  Barnette did not place Diffey in a position Gibson sought.

Plaintiff has failed to meet her burden of raising a genuine issue of fact with respect to the legitimacy of this articulated reason.  Gibson has failed to point to any evidence suggesting that Flagstar's explanation of Diffey's status is untrue.  As stated above, her own testimony supports Flagstar's contentions.

Assuming that Barnette erroneously promoted Seals, Leeth, or Diffey, such an error in judgment is insufficient as a matter of law to establish pretext.  Misguided and even unfair personnel assessments are not actionable unless an impermissible factor played a role in the evaluation.  *Nix v. WLCY Radio/Rahall Communications, Inc.*, 738 F.2d 1181, 1187 (11th Cir. 1984).  As the Eleventh Circuit has cautioned, courts should "not sit as a super-personnel department that examines an entity's business decisions."  *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) (citation and quotation marks omitted).

Gibson offers nothing more than her own speculation that Barnette's promotion decisions were racially discriminatory.  Accordingly, her claims fail.  *See Elrod v. Sears, Roebuck & Co.*,

---

[14] To the extent that Gibson alleges in her affidavit filed in response to the Defendant's Motion for Summary Judgement that Diffey received a promotion over her, such allegation contradicts her prior sworn testimony and cannot create a genuine issue of fact as a matter of law. *See Van T. Junkins & Associates v. U.S. Industries*, 736 F.2d 656, 657 (11th Cir. 1984). Nonetheless, had Diffey been awarded the general manager position, Gibson still cannot establish a prima facie case as there is no evidence that she was qualified to be the general manager. During the winter and spring of 1998, Gibson had repeated performance problems and received a marginal performance evaluation. (Barnette Decl. ¶14.) *See Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520-21 (11th Cir. 1990) (plaintiff's failure to meet employer's performance expectations prevented him from establishing a prima facie case); *Mills v. First Federal Savings & Loan Ass'n*, 83 F.3d 833, 843 (7th Cir. 1996) (same).

939 F.2d 1466, 1471-72 (11th Cir. 1991) ("conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions") (citations and quotations omitted).  Therefore, defendant is entitled to judgment as a matter of law.

### ii.   *Discipline*

#### *(a)   Prima Facie Case*

To establish a prima facie case of disparate discipline, Gibson must demonstrate that: (1) she is a member of a protected class; (2)  she engaged in misconduct similar to that of a non-protected person; (3)  and similarly situated employees outside the protected class received more favorable treatment. *See Jones v. Bessemer Carraway Med. Center*, 137 F.3d 1306, 1311 n. 6, *modified*, 151 F.3d 1321 (11th Cir. 1998) (modified in part on other grounds); *Nowlin v. Jones Intercable, Inc.*, 2000 WL 700267, at *4 (S.D. Ga. February 7, 2000).  Gibson cannot establish a prima facie case because she has not identified a similarly situated white comparator who was treated more favorably with respect to discipline. *See Nix*, 738 F.2d at 1186.  By comparison, Flagstar has produced evidence that demonstrates that Barnette and Leeth routinely disciplined white employees for virtually the same infractions. (Corbett Decl. ¶ 2, ex. A; Barnette Decl. ¶ 10.)

#### *(b)   Legitimate Nondiscriminatory Reason*

Assuming arguendo that Gibson established a prima facie case, however, Flagstar has met its burden of articulating a legitimate, nondiscriminatory reason for its actions.  Defendant contends that Leeth and Barnette disciplined Gibson for poor performance. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (concluding that poor performance and

32

insubordination were legitimate nondiscriminatory reasons for employer's action); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (holding that an employer's good faith belief that an employee's performance is unsatisfactory is a legitimate, nondiscriminatory reason for an adverse employment action).

### (c)    *Pretext*

Gibson has failed to produce any evidence raising a genuine issue of fact as to pretext. In fact, the evidence demonstrates a lack of discriminatory animus. First, Leeth, who issued all but one of the write-ups to Gibson, is in the same protected class as Gibson. This fact strongly suggests that her disciplinary decisions were not based on race. *Rooks v. Girl Scouts of Chicago*, 1995 WL 562126, at *7 (N.D. Ill. 1996) (noting that "if decision maker is in same class as the plaintiff, claims of discrimination become less plausible") (citations and quotations omitted). Gibson attempts to counter this evidence by claiming that Leeth was simply carrying out Barnette's instructions. (Gibson Dep. at 184-85, 235-38.) Gibson, however, has no personal knowledge of any such conversation between Leeth and Barnette, and her belief that Leeth was acting on Barnette's instructions is admitted speculation. (Gibson Dep. at 238).[15]

Additionally, as evidence of pretext, Gibson asserts that "other white assistant managers were not held accountable for the performance of the store." (Pls.' Br. at 15.) However, Gibson has failed to produce any evidence to support this allegation. In fact, the evidence indicates that Leeth and Barnette disciplined white employees as well as Gibson. (Barnette Decl. ¶ 10, ex. C;

---

[15] Even if Gibson's allegation is true, there is no evidence that suggests that Barnette was motivated by race. Gibson testified that Barnette was not often in the restaurant and that Leeth reported to him about the performance of employees. (Gibson Dep. at 236.) On the basis of those reports, Gibson claims that Barnette instructed Leeth as to which employees to write-up. (*Id.*) If true, such facts suggest that if any discriminatory animus existed, it stemmed from Leeth rather than Barnette. Gibson admitted that if Leeth told Barnette that she engaged in misconduct, it would have been appropriate for Barnette to instruct Leeth to give her a write-up. (Gibson Dep. at 237.)

Corbett Decl. ¶ 2, ex. A, pp. 1-3, 7-12, 13-14, 20-23, 25-29, 31, 32-37, 38-41, 47-48, 51-55, 56-62, 63-65.) Barnette wrote up Gibson, Leeth, and Seals, and drafted a Development Plan for Tracy Wright, a white general manger, nearly identical to the one he drafted for Gibson. (*See id.*) Likewise, Leeth wrote up the white shift leaders for the same infractions for which Gibson was written up. Such evidence of equal treatment is strong proof that Gibson was not singled out by Barnette or Leeth. *See, e.g., Pollard v. Red Magnet Wire Co.*, 824 F.2d 557, 558 (7th Cir.) (no pretext where evidence demonstrated that all employees who violated the work rule in question were disciplined).

Gibson further alleges that after she filed an EEOC charge, she was treated worse and received more write-ups. (Gibson Decl. ¶ 10.) This contention ignores the undisputed evidence. Although the record indicates an increase in write-ups in March of 1998, they dropped off significantly in April of 1998, and then discontinued entirely.[16] As to the write-ups which occurred in March, Leeth disciplined the white, and non-complaining, employees for the same infractions. Further, Barnette drafted Development Plans for both Gibson and Wright during this same time period. Moreover, Gibson admits that many of the write-ups were legitimate. Considering all the evidence, Gibson's contention regarding the frequency of the write-ups simply does not suggest a racial motive.

Gibson's claims that she was a good performer and that Leeth "falsely" disciplined her on two occasions is not sufficient to prove pretext. The pretext inquiry centers upon the employer's beliefs, not the employee's perceptions of her performance. *Holifield v. Reno*, 115

---

[16] During the three months following the EEOC charge, Gibson received nine write-ups. This is consistent with the number other employees received. For example, during the three months from August 20, 1997, through November 21, 1997, Seals was written up seven times. (*See, e.g.,* Barnette Decl. ¶ 10, ex. C.)

F.3d 1555, 1565 (11th Cir. 1997).  In *Holifield*, the Eleventh Circuit, evaluating a retaliation

claim brought by a plaintiff who, like Gibson, argued that his employer unjustly criticized his

performance, stated:

> [W]here the employer produces performance reviews and other documentary
> evidence of misconduct and insubordination that demonstrates poor performance,
> an employee's assertions of his own good performance are insufficient to defeat
> summary judgment, in the absence of other evidence.

*Holifield*, 115 F.3d at 1565.  Like the plaintiff in *Holifield*, Gibson offers no evidence that Leeth

had anything other than a good faith belief that she was disciplining Gibson for anything other

than legitimate performance problems.  Even assuming Leeth and Barnette erroneously

disciplined Gibson, such an error in judgment, without more, is insufficient as a matter of law to

establish pretext.  *See Nix*, 738 F.2d at 1187.

The strong evidence of Flagstar's good faith belief that it disciplined Gibson for

legitimate reasons, as well as Gibson's lack of evidence discrediting that belief, precludes

Gibson from meeting her pretext burden.  Thus, Flagstar is entitled to summary judgment.  *See*

*Elrod*, 939 F.2d at 1470 (employer who disciplined employee for violation of sexual harassment

policy entitled to summary judgment where employee produced no evidence discrediting the

employer's actions or otherwise calling into question the legitimacy of the employer's belief that

the employee was guilty of sexual harassment); *Hawkins v. Ceco Corp.,* 883 F.2d 977, 980 n. 2

(11th Cir. 1989) (That the employee did not in fact engage in misconduct reported to the

employer is irrelevant to the question of whether the employer believed the employee had done

wrong.).

### iii.   *Training*

#### (a)   *Prima Facie Case*

Gibson claims that Barnette refused to send her to "management training school" because of her race, first in 1995 or 1996, (Gibson Dep. at 133-34), and again in late 1997 or early 1998, (*Id.* at 142-43).  To meet her prima facie burden, Gibson must point to a similarly situated, white comparator who Barnette sent to the management training school under the same or similar circumstances under which he purportedly refused to send Gibson. *See, e.g., Holifield*, 115 F.3d at 1562 (to establish a prima facie case, plaintiff must show that non-members of protected class were treated more favorably).

Gibson has not established a prima facie case because she has not identified a proper comparator.  The only employees Gibson identified who attended "management training school" were the three shift leaders: Faulkner, Gilliland, and Bussey.[17]  (Gibson Dep. at 137-42.)  These individuals are not proper comparators because they are not similarly situated to Gibson.  It is well-recognized that an alleged comparator must be "similarly situated" in all relevant respects. *Holifield*, 115 F.3d at 1562; *Malladi v. Brown*, 987 F.Supp. 893, 909 (M.D.Ala. 1997).  The simple allegation that another employee was treated differently, without proof that the employee was similarly situated to the plaintiff, fails to establish a prima facie case. *Malladi*, 987 F.Supp. at 910.  The above-named shift leaders do not meet this standard.  All three shift leaders were hourly employees with no experience as a salaried manager.  (Barnette Decl. ¶ 18-19; Corbett Dep. at 24-26.)  By contrast, Gibson was a salaried manager with several years of experience.

---

[17] Gibson also claims that Leeth was sent to management training school in the early 1990's. (Pls.' Br. at 13.)  However, such a fact tends to disprove rather than prove Gibson's claim because Leeth is also African-American.  Further, there is no evidence that Barnette was the decision maker with respect to Leeth's attendance, or that the training program she attended was the same one Gibson was not permitted to attend.

The only proper comparator would be a white assistant manager with experience comparable to Gibson's who Barnette sent to shift leader training. Gibson has not identified such a person. Thus, Gibson has failed to establish a prima facie case.

### (b)     *Legitimate Nondiscriminatory Reason*

Assuming that Gibson established a prima facie case, however, defendant has articulated a legitimate, nondiscriminatory reason for not sending Gibson to shift leader training school. Barnette stated that he believed that it was not necessary for Gibson to attend such training. Barnette sent the three shift leaders to a training school for shift leaders to learn procedures and skills that he believed Gibson, a seasoned manager, already possessed. (Barnette Decl. ¶ 18-19.)

### (c)     *Pretext*

Gibson has failed to produce any evidence raising a genuine issue of fact as to pretext. Gibson has not produced any evidence that defendant's articulated reason is false or unworthy of credence. Gibson cannot dispute that it was unnecessary for her to go to the shift leader training school because she admits that she does not know what was taught at the school. (Gibson Dep. at 130.) Also, it is undisputed that Barnette directed her to go to management training classes that were appropriate for her level of experience which she failed to complete. (Barnette Decl. ¶ 16.) Far from denying Gibson training, he offered it to her.

Gibson's inability to point to any evidence calling into question Barnette's reasons for his actions prevents her from proving pretext. The fact that Barnette sent the hourly shift leaders to *shift leader* training simply does not suggest that he did not send Gibson, a *manager*, to *shift leader* training because of her *race*. Thus, Flagstar is entitled to judgment as a matter of law as to this claim as well.

### iv.    Remaining Allegations

Gibson also alleges that: (1) Barnette "forced" her to work out of job classification without a promotion or a pay increase; (2) Barnette told her, as well as the entire management team, that they had to prove themselves in order to receive a promotion; and (3) Barnette refused to give her a bonus check after she quit her job. (Gibson Dep. at 107, 113, 152-53, 241-44, 249-51.)

### (a)    Working Out of Job Classification

Gibson cannot establish a prima facie case with respect to this claim because she has not identified a similarly situated, white employee who was treated more favorably than she was. Although she claims that "white assistant managers" were not required to work out of their job classifications without a promotion or pay increase, Gibson does not identify those individuals. (*See* Pls.' Br. at 16.) Gibson's conclusory allegations are insufficient as a matter of law to establish a prima facie case.

Barnette stated that it was not unusual for assistant managers to run a restaurant without a promotion or pay increase while the area manager was seeking a new general manager. (Barnette Decl. ¶ 11.) The evidence further suggests, as discussed above, that Gibson was a poor performer, and there is nothing in the record establishing that Barnette "should have" promoted her. In short, Gibson's allegation is simply a reiteration of her promotion claim, which the court has addressed above.

### (b)    Comment to the Management Team

Gibson cannot establish a prima facie case with respect to this claim because she has not identified a similarly situated, white employee who was treated more favorably than she was. Barnette told the *entire management team*, not just Gibson, that they had to prove themselves based on the prior poor performance of the Jasper Hardee's. (Gibson Dep. at 244-45.) By

38

Gibson's own testimony, he was treating *all* managerial employees alike. (Gibson Dep. at 152-53, 244-45.) Gibson alleges, without support, that Seals was not required to prove himself. (Pls.' Br. at 16-17.) The evidence before the court, however, shows that Barnette told Seals that he would make him a general manager if he could demonstrate that he could handle the job. (Barnette Decl. ¶ 9.) Like Leeth, Barnette made Seals an acting general manager (at the Sumiton Hardee's while Tracy Wright was on maternity leave) to see if he could perform the job satisfactorily. (*Id.*) Similarly, Gibson's contention that Barnette did not require Wright to "prove herself" prior to "promoting" her to restaurant manager, (Pls.' Br. at 16-17), misconstrues the evidence. Wright, unlike Gibson, had previous experience as a general manager (at Sumiton) and was demoted, not promoted, to restaurant manager. Thus, Wright is not an appropriate comparator.

**(c)**     ***Bonus***

Gibson also cannot establish a prima facie case with respect to this claim because she has not identified a similarly situated, white employee who was treated more favorably than she was. Gibson has not identified any white employee who quit without notice and still received a bonus. Gibson has also failed to offer any evidence calling into question Flagstar's legitimate nondiscriminatory reason, i.e., application of the bonus policy, (*see* Corbett Decl. ¶ 4.)

*v.*     *Conclusion*

Based on Gibson's failure to even raise an inference of discrimination, as well as Flagstar's strong justification evidence, Flagstar is entitled to summary judgment on the balance of Gibson's race discrimination claims.

**2.**     ***Gibson's Retaliation Claim***

Plaintiff also alleges she was subjected to illegal retaliation. In support of her retaliation claim, Gibson alleges after filing her EEOC charge, she was discriminatorily disciplined and the

39

number of "write-ups" she received increased. (*See* Amended Complaint ¶ 27 (p. 5-6) ; *see also* Pls.' Br. at 17-18.) Also in support of her retaliation claim, Gibson alleges that defendant refused to pay her a bonus to which she alleges she was entitled. (*See* Amended Complaint ¶ 28 (p. 6).)

Under Title VII, employees are protected from retaliation for opposition to unlawful employment practices or for making a charge, testifying, or participating in any investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000-3(a). In analyzing plaintiff's claim, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence).[18]

### a.    Prima Facie Case

In order to establish a prima facie case of retaliation, plaintiff must demonstrate, (1) that she engaged in a statutorily protected activity; (2) that the employer took some adverse employment action against her; and (3) that a causal connection exists between the two. *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992) (citations omitted); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). Plaintiff engaged in statutorily protected activity in that she filed an EEOC complaint and voiced her concerns about racial discrimination to Leeth, her supervisor. Further, plaintiff alleges that she "suffered adverse employment action during this time [because she] was [written] up on numerous occasions for the poor performance of the restaurant . . . and was also written up on false charges

---

[18]   This framework is set out in Part B(1)(b) of this Opinion.

by Leeth after she complained of discrimination." (Pls.' Br. at 18.) However, the fact that the adverse employment action was taken after the protected activity, is generally insufficient by itself to prove a causal connection to satisfy a prima facie case. *See Booth v. Birmingham News Co.,* 704 F. Supp. 213, 215-17 (N.D. Ala. 1988); *Hamm v. Members of Board of Regents,* 708 F.2d 647, 652-54 (11th Cir. 1983) (holding that plaintiff failed to establish a causal link between her transfer and her protected activity even though she was transferred shortly after filing a written complaint with the EEOC).

### b.      Legitimate Nondiscriminatory Reasons

Even assuming that Gibson has established a prima facie case, Flagstar has asserted legitimate, non-retaliatory reasons for its actions. Leeth and Barnette disciplined Gibson for poor performance. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (concluding that poor performance and insubordination were legitimate nondiscriminatory reasons for employer's action); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (holding that an employer's good faith belief that an employee's performance is unsatisfactory is a legitimate, nondiscriminatory reason for an adverse employment action). Additionally, in 1998, after HFS took over from Flagstar, a managerial employee who quit his or her job without notice, or who was terminated, was not entitled to receive a bonus. (Corbett Decl. ¶ 4.)

### c.      Pretext

The same justification evidence that defeats Gibson's race claim also refutes her claim that Flagstar's conduct was a pretext for retaliation. As evidence of pretext, Gibson alleges that (1) she was the only assistant manager written up for the poor performance of the Jasper Hardee's; (2) the write-ups allegedly increased after she filed her EEOC charge; and (3) Leeth purportedly "falsely" wrote her up on two occasions. (Pls.' Br. at 17-18.) Considering these

41

allegations in a light most favorable to Gibson, they still do not raise a genuine issue of material fact with respect to the legitimacy of Flagstar's reasons for disciplining Gibson.

As noted above, Gibson clearly was not the only employee written up for the poor performance at the restaurant. Non-complaining employees were written up as well. Gibson's contention that she was twice "falsely" written up is based on nothing more than her contention that she did not commit the infraction. As noted above, Gibson has offered no evidence indicating that Leeth had anything other than a good faith belief that she disciplined Gibson for legitimate reasons. Gibson's claim that the write-ups allegedly "increased" after she filed her charge is significantly undercut by her admission that many of those write-ups were, or possibly could have been, legitimate. (Gibson Dep. at 156-57, 169-70, 181-83, 185-86, 203-05.) Further, Gibson ignores the fact that she was written up before, as well as after, the filing of her charge. Moreover, although Gibson received a number of write-ups in March, she only received two in April and zero in both May and June. (Gibson Dep. at ex. 13-14, 19, 21-24, 27-28.)

As noted, it is undisputed that Gibson received a number of write-ups both *before* and *after* she filed an EEOC charge on February 3, 1998. This refutes any inference that Gibson's protected activity was a motivating factor in the decision regarding her employment. Additionally, Gibson has failed to offer any evidence calling into question Flagstar's legitimate, nondiscriminatory reason for refusing to pay her a bonus, i.e., application of the bonus policy, (*see* Corbett Decl. ¶ 4.)

Gibson essentially argues that the proximity in time between the filing of her charge and the adverse employment actions is sufficient to raise a genuine issue of fact. The close proximity of a plaintiff's protected activity to an alleged adverse action is insufficient to create a genuine issue of fact where the employer has stated a strong, credible reason for its actions. *Tipton*, 872 F.2d at 1495 (no genuine issue of fact where plaintiff complained of sex

42

discrimination and was terminated the next day, where the employer offered strong evidence that plaintiff was terminated for insubordination); *Simmons v. Camden County Board of Education*, 757 F.2d 1187, 188-89 (11th Cir. 1985) (proximity of plaintiffs' EEOC charges insufficient to show pretext).

Like her race claim, Gibson bases her retaliation claim solely upon her own speculation. Such "evidence" is insufficient to survive summary judgment. *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989); *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988). Thus, defendant is entitled to judgment as a matter of law as to Gibson's retaliation claims.

### 3. *Gibson's Constructive Discharge Claim*

Gibson claims that defendant's actions forced her to quit her job. In order to establish a claim for constructive discharge, an employee must prove that his or her working conditions were so "difficult or unpleasant" that a reasonable person would have felt compelled to resign. *Hill v. Winn-Dixie*, 934 F.2d 1518, 1527 (11th Cir. 1991). This standard requires a high degree of deterioration in an employee's working conditions approaching the level of "intolerable." *Id.*

Gibson cites the following grounds for her decision to quit in July 1998: (1) she was denied adequate training on how to correctly perform her duties; (2) she received numerous write-ups during 1998, and (3) Barnette stated at a meeting with Leeth, Gibson, and the white shift leaders in May of 1998, that they would all have to "prove themselves" in order to receive a promotion. (Pls.' Br. at 18; Gibson Dep. at 239-245.) Gibson further alleges that "she would never be able to prove herself to Mr. Barnette, especially when she had no idea of what he expected of her," and because she had no chance of proceeding further within the company, she was forced to quit. (Pls.'s Br. at 18-19.) These reasons are insufficient as a matter of law to support a constructive discharge claim.

43

First, it is undisputed that the last write-up Gibson received was on April 24, 1998, over two months prior to her resignation. Based on this significant lapse of time, the write-ups cannot legitimately form the basis for a constructive discharge claim. *See, e.g., Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1313-14, 1317 (11th Cir. 1989) (affirming judgment for employer that employees were not constructively discharged where last incident of harassment occurred two weeks before resignation); *Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991) (no constructive discharge where plaintiff remained employed for six months after last alleged incident of harassment). Indeed, a reasonable person would consider fewer write-ups a sign that the work environment was *improving* rather than *deteriorating*.

Likewise, Barnette's comment to the management team simply does not evidence an intolerable work environment. Assuming the comment carried some negative connotation, it was not directed at Gibson individually and was not overtly hostile, abusive, or threatening. Moreover, the balance of the evidence fails to demonstrate that Gibson's working environment was "intolerable." In fact, the evidence indicates that from mid-May through the time of her resignation in July, Gibson continued to work, she asked for and received a regular day off every week  to attend college classes, and she went on vacation. (Gibson Dep. at 239-40, 246-47.) This is hardly an "intolerable" working environment from which a reasonable person would feel compelled to escape.

Because her working environment was not intolerable as a matter of law, Gibson's constructive discharge claim fails and Flagstar is entitled to judgment as a matter of law on this claim as well.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted and costs taxed against plaintiffs.  An Order in

44

accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this ___9th___ day of August, 2000.

**SHARON LOVELACE BLACKBURN**
United States District Judge